Court of Appeals to the Fifth Circuit is now open according to law. God save the United States in this honorable court. Thank you. We are hearing a case this afternoon in 25-40233 State of TX v. R J Reynolds Tobacco Company. Mr. Liebenstein, I hope I pronounced it right. You did, your honor. You did, your honor. We're ready for you. Oh, okay. Thank you. Okay. Good afternoon. Ellie Liebenstein on behalf of R J Reynolds Tobacco Company. May it please the court. RGRT appeals from district court's rulings on liability to the state, allocation of that between PMUSA and RGRT and pre-judgment and post-judgment. I will start with allocation, even though it depends on liability and we obviously contested because I think it could use some clarification. RGRT and PMUSA disagree about the allocation for the years 2018 and 2019. Let me first describe the chronology underlying the ITG status agreement, which the parties agreed governed the allocation. The profit adjustment to the settlement payments is based on a comparison of base-year operating profits and current-year operating profits. At first, the four RGRT brands sold to ITG in 2015 were included in RGRT's 1997 base-year profits because they were owned by RGRT in 1997. But they were not included in RGRT's current-year profits because they were no longer owned by RGRT after June 2015. Then, in February 2020, the court ruled that RGRT was liable for settlement payments on brands sold to ITG and that, therefore, profits on those brands need to be included in RGRT's current-year profits as well. As a result, RGRT owed an additional profit adjustment. Importantly, under the order and calculated by PWC, in March 2020, RGRT's and ITG's profits were combined as if one company for purposes of the base-year and the current-year. Before payments were made under order, however, the parties settled in May 2021. Importantly, for purposes of 2015-2019, that settlement, the ITG status agreement adopted the PWC calculations as set forth in notice IDs SS-208 and SS-209 that's in the record of 61376. Also, as the agreement makes clear, these notices were based on the court's February 25, 2020 decision on the state's and PM's USA's motion to enforce. As the agreement stated, the profit adjustments as set forth in these notices already account for the covered brands in the profit adjustment calculation based on the court's February 5, 2020 decision and that continued at 61376 and so there is no need to recalculate for those years because PWC already did so based on the court order at section 5.4. Thus, for those years, the agreement makes clear that calculations are based on the court's decision which combined RGRT's and ITG's profits in the base-year and the current-year. The parties agreed that starting in 2020 to separate the base-year profits of ITG and RGRT in both the base-year and the current, as it says, beginning in January 1, 2020, that's in sections 5.5 and 5.6. This chronology demonstrates that for 2015-2019, the allocation of any profit adjustment liability between RGRT and PM USA is to be based on a combined basis of RGRT and ITG's profits. It also makes clear that the arguments to apply the post-2020 methodology for the years 2015-2019 to backfill are based on false premises. In the allocation order, Judge Gilsbreth assumed that for 2015-2019, ITG's profits were not included at all. His allocation order omitted it, that's at 61524, but ITG was included for those years as a settlement defendant. Just its profits were RGRT's profits. There is no gap and no need to backfill. PM USA's appellate brief abandons this court's reasoning and instead says that 2015-2019 were recalculated using an $860 million base-year for the brands and separates out the base-year and the current-year profits for RGRT and ITG. But this is not so. In fact, the record reflects that in 2015-2019, the PWC notices implemented the court ordered RGRT and ITG's profits were combined and no recalculation. In fact, the language that PM USA uses to say recalculated is from 2020. There is no recalculation for 2015-2019. In fact, the ITG status agreement specifically says there is no need to recalculate for those years. Under the ITG status agreement, the allocation for 2015-2019 should be with the profits of RGRT and ITG combined as ITG is a settlement defendant. There is nothing in the agreement, the original Texas Settlement Agreement, that requires the allocation to be combined or together. And through 2015, we chose one way, and after 2019, we chose another way. On liability, I'm happy to answer any question the court may ask, but I would like to highlight one point which is dispositive. The agreement says the tax rate in effect in the applicable year, that's Appendix A, B, Romanat 2, clause 2. Then the agreement explains such rate being 35% as of May 1st, 2001. The only place the number is explained. The state claims that the applicable year tax rate, which is the current year, applies only to the current year and does not apply to the 1997 basis. But if so, why say what it is as of the current year 2001? Anybody can look it up. The reason is that the tax rate of the applicable year is applied for both the base year and the current year. And the parenthetical explains that 35% is used for the base year also. Because that is the rate in effect in 2001. That is the way the amount in the Calc, that is the way the, that is why the amount in the last clause is only an example by applying the foregoing definition. It uses 35% tax rate because that was the tax rate as of that time. If the tax rate changes as it did in 2018, then the new rate needs to be applied to the base year as well. It's actually the fact that the applicable year is used in two different clauses actually supports our argument. In the first clause, where applicable year is used in the context where the taxes were taken out and not discussed, and therefore the only issue is the profits, over there it makes sense that the applicable year refers only to the current year. In the second clause of B. Robinet 2, over there where what had been taken out of the tax rate is now included in a separate clause and it's given a specific parenthetical to explain as of 2001. At that point, the only logical reading is that the base year, I'm sorry, that the applicable year applies to both the base year and the current year. Thank you. I reserve the rest of my time. Mr. Shaikness, I think again if I'm incorrect about the pronunciation, please let me know. You're muted. Can you hear me? Yes. Thank you. Your pronunciation was perfect. Thank you. Good afternoon. Alexander Shaikness on behalf of Philip Morris. May I please the court. There are two questions before the court today, as Mr. Lieberstein noted. Whether Reynolds and Philip Morris owe additional payments to the state of Texas, and if they do, how these payments are to be allocated between them. First, I will turn to the liability. It turns on the interpretation of the profit adjustment provision of the Texas settlement. Mr. Lieberstein, on behalf of Reynolds, just explained how the definition of the profit adjustment in that provision makes base year profit change with changes in the tax rate, and Philip Morris fully agrees with his explanation. I just want to emphasize a couple of points. First, the agreement clearly defines the base profit as a formula, not as a number, and that point is then emphasized in the following sentence. Applying the foregoing definition, the settling defendant's aggregate net operating profits in 1997 were $3 billion and change. And I'd really would like to focus your attention on that one sentence because I think it is critical. The state argues that this sentence is where the base profit is set at $3 billion for all times. And in fact, if you look at it closely, the sentence does the opposite. There are three critical points I'd like you to note about the sentence. First, it explicitly refers to the foregoing definition. So it says that the base profit is a formula. You have to apply the formula. That's what the foregoing definition is. Second, the foregoing definition, as Mr. Lieberstein just pointed out, includes tax rate for 2001 because that's when the provision was drafted, not 1997. So when you calculate this $3 billion number for the base, it says in the foregoing definition, as the sentence says, says use 2001 rate, not 1997 rate. And third, I think is the most important point. It's the last but really most important. What's important is what the sentence does not say. If you look at the sentence, it does not use the defined term base operating profit. It's nowhere to be found in the sentence. If the state were right, that the parties intended to set the base operating profit at $3 billion, all the sentence needed to do is to say the base is $3 billion. That's it. We wouldn't be here if the agreement said so. Counsel, it seems to me there's a lot of clarity and hindsight that could be added to this. One way to interpret that formula that, for reference to what 1997 would be, it was the exemplar. It showed how this calculation was to be made in the future. And it used it first to show how it was done for 1997. And whether that number then becomes fixed or not is a matter of interpretation, but it shows that what's going to happen in the future is also what we did for 1997. You want to keep changing the tax rate, but nonetheless it was 21% in 1997 as well, was it not? That's correct. All I'm saying is you want to give certainty to the three points you made or whatever else about that sentence. All I see is it was showing how this number, $3 billion plus, was developed. And whether that then became the permanent number for 1997 would have been helpful for the agreement to say, or that it wouldn't be, would have been helpful for the agreement to say. But I don't see the certainty that you see in that absence of referring to it as the constant base year calculation. A couple of things, Your Honor, give me that certainty. First of all, the simplicity of drafting. It's very easy to use a defined term here. It is very specifically avoided. It would be very easy to say the base operating profit, using the foregoing definition, is $3 billion as a defined term. Very simple. Second point I would like to make is that you're right. It would be easy 25 years later for me to stand here and tell you that this agreement could have been drafted better. But it's not what I'm doing. Consider the master settlement agreement. It existed at the time. It predates this agreement. The master settlement agreement has a parallel provision, which was used as a template to amend the Texas agreement. The provision you're looking at is an amended provision. And it was amended using the MSA as a template. If you put them two together, you don't need to take my word for it. It's obvious. It's copy and paste in many places. It's obviously MSA, which was much more detailed than the original Texas agreement, was used as a template for this. The one thing the MSA does not have is a tax rate. And what does the MSA do when there is no tax rate? Right there on the first page, which is very similar to this agreement, the first page where the base is defined, it says base is $7 billion. It actually defines the base as a number. And the parties were looking at the MSA when they were drafting it. It's not me now telling you, oh, I could have drafted it better today. At the time, the parties were looking at this agreement, at the MSA, because the original Texas agreement was done very quickly on the courthouse steps. It didn't have any of this detail, if you look at it. It was really bare bones. And then after the MSA, which was negotiated carefully over a long period of time, much more carefully drafted. And then this was amended to follow that as a sample. And in the MSA, it says the base is $7 billion. It's a different year, so the number is different. And it doesn't have a tax rate. So the parties absolutely knew how to do it simply. Define the base as a number. And they did so. In another agreement. One thing, Mr. Shackness, it seems to me is they were, one way to interpret it is that the agreement was showing its work. It was showing how that $3 billion was determined. And whether it then becomes permanent is a different question. Permanent for all future calculations on change and net operating profits. But I'm just repeating myself. And you'll probably have the same answer to it. But I just, I don't see the certainty of it. Let me ask you a factual question. I guess it's factual. There's some discussion in the brief about a Mississippi case about their claims. And it was in the Chantry Court on the coast. Didn't appeal to the Supreme Court. My understanding from looking on the Supreme Court docket in Mississippi is that case is over and it was settled. And I can't remember now if your position on it was irrelevant or relevant. But is that true that that case is done by, is finished due to settlement? That's correct, Your Honor. All right. Continue, I didn't have enough questions. Yeah. Since you're asking the factual question, I want to point out that the drafter who did this provision using MSA as a template was me. So I will take the blame for not being clear. I feel I'll switch to the allocation point. So the allocation on this question, where the appealee. So naturally, we think the district court got this one right. And the question, as you know, Mr. Livingston explained it well. The only question before this court is very narrow. Whether to include ITG, not ITG's profits and volumes, but ITG as a settling defendant in the calculations. So mechanically speaking, Pricewaterhouse does the calculations and it has a line for each company with its volumes and profits. So it's really a mechanical question. Is ITG included as a settling defendant in the calculations with its own volumes and profits? And the agreement that controls this question, the ITG status agreement, is crystal clear. It says it over and over and over. In section one, in section three, in section five, it says ITG is to be treated as a settling defendant for all purposes as of the date it bought the brands from Reynolds, which is June 2015. So as of June 2015, you'll find it at least three, four times in the agreement. The district court quotes all of those provisions in its opinion and it says over and over and over as a settling defendant for all intents and purposes, for all calculations. So I do not know how Reynolds can read that agreement in any other way than saying what it says multiple times. It's really belt and suspenders. We said it multiple, multiple times in this agreement. There is no question. They are settling defendant for all intents and purposes as of 2015. I also would note, I know I'm out of time, so I don't know if I can make one more point. I would note that their provision also would produce a nonsensical result because when ITG joined, the payments were reallocated. The past payments were reallocated. So what they're saying is that now that it's found that using simple numbers, say there are two parties who owe a third party $100 million in past payments and continue paying. Then an event happens, ITG joins, and it's reallocated. And now this $50 million initially was allocated, say, 50-50, and now it's allocated 60-40. So the parties made the reallocation, paid $10 million one to another, changed it. Now the second event happens, this court's liability decision. And one party asks, says, okay, well, how do we allocate the extra money? Well, of course, the extra money should be allocated the same as the original money was finally allocated to the same 60-40. Reynolds is saying, oh, no, let's go back to the old allocation, which is no longer valid. Let's allocate it again 50-50. It just makes no sense. It's unreasonable. And as I'm sure you know, there is a long line of Texas Supreme Court cases applied often by this court that says the court should avoid interpretation that leads to unreasonable and inequitable results. So it's both in this case. It really is both. The district court is correct. I'm sorry, Your Honor. We got your argument. You saved some time for rebuttal. Would you add three minutes to the State of Texas's time, please? Thank you, Your Honor. Mr. Ryans. Can the camera be adjusted? There you go. Okay. Thank you, Your Honor. It's an auto-adjustable camera. Oh, thank you. Yes. Good afternoon. Zach Ryans from the State of Texas. May it please the court. The district court did not err when it determined that for the purpose of the profit adjustment calculation under the Comprehensive Settlement Agreement, the base net operating profits of defendants from 1997 was $3,115,100,000. Nor did the court err in awarding both pre-judgment interest from the date of underpayment and post-judgment interest from the date of the merits ruling. And I'll address each of those in turn. So, to begin, the CSA, as amended in 2001, is unambiguous. It specifically states that the settling defendants' aggregate post-tax net operating profits from 1997 were $3,115,100,000,000. Now, the settling defendants are placing a lot of emphasis on the precursor to that sentence or the preamble to that sentence that says, using the foregoing definition. But, Your Honor, all that means is simply that the parties agreed on a method to get to a number and they agreed on a number. And that number is set in stone. And this makes sense. If I made $100,000 in 1997, taxed at a 10% rate, my post-tax net operating profit would be $90,000. If that tax rate then changes to 5% sometime later, and I make that same $100,000 that year, my aggregate post-tax net operating profit would be $95,000. Just because the tax rate changed in a later year does not affect the profits of the 1997 calculation. I'm sorry, Your Honor? I have a question. I don't know why you stopped, but I'll throw mine in. It seems to me that one of the problems in the case, in understanding what this change in tax rate does, is I think there is evidence, there certainly is a statement in a brief, that the maximum corporate tax rate has very little to do with the amount of taxes that either one of these companies actually pays. And it is, in a way, a reference to a reduction that I guess the tobacco companies got into the calculation for net operating profits. But it's not a real number. It's not a real number of actual taxes paid. And particularly, if you're looking at net operating profits, which would not include taxes in the first place, as the basis for deciding the number with further adjustments, against which the percentage will apply, net operating profits just seems independent of taxes. So what do you say to the argument, and I wonder what existed as evidence in 1997 or 2001, as to the tax history of how much that maximum tax rate actually correlated to the taxes either one of these companies paid. But doesn't the fact it's an artificial, a fictional number, affect how it ought to be  It doesn't, Your Honor. That number was agreed upon by the parties. Well, no, it's a real number. But insofar as your point that you don't keep changing the number in 97, if it's a fake number in the first place, that you're just keeping the basis and the new number comparable by adjusting both. If you didn't hear a question, there was one intended, but I'll try again. No, no, Your Honor. I'm sorry. I'm just thinking about it. I think that, you know, settling defendants make a lot of, they emphasize the sort of comparison that this needs to be apples to apples. Well, we're not really focused on the tax to get to your question. We're actually focused on the profits with whatever that reduction is for the tax rate. Right. And so the settling defendants paid a higher effective corporate tax rate in 1997 than they did in 2019 or 2020. And that allows them to have a different net operating profit post tax because of that. It really doesn't make a lot of sense to have a floating tax because then you're not comparing apples to apples. You're comparing financials from 1997 as with a tax rate applied from 2018 to financials from 2018 applied to a tax rate from 2018. I have a question. Go ahead. Sorry, Judge. I don't understand the theory behind this. If they wanted a fixed number, why would they add a tax rate at all? Why would they ever look at a tax rate? They would say that the fixed net operating amount net of any corporate tax is X. And then you're going to compare that to future rates without corporate tax. I don't understand why you would have whatever the maximum corporate rate is unless you were intending to make it float. You would have the maximum effective corporate rate simply to understand how the parties got to that number, that $3.1151 billion number. Well, why would you say that in 2001, here's the number, here was the net operating profit net of taxes. And so going forward, we look at your operating profits net of taxes, of corporate taxes, so that we're always looking at apples to apples. But that's not what they said. They said we're calculating the 2001 year on a 35% corporate tax rate. But in the future, we look at not 35% but what the actual rate is. Do you see what I'm saying? And then taxes aren't normally considered part of profit. So why would you use tax that way? I can't speak as to why the parties chose to incorporate taxes into the aggregate post tax net operating profit to answer your latter question first. To answer your former, to answer the, I'm not sure that I understand your first question,  but if the parties wanted to have fixed rates, if they want to have a $3 billion number, whatever it is, they want a fixed number. They would have said the net operating profit in 2001 was X billion dollars. And going forward, we will calculate net operating profits minus or not including the corporate tax rate, whatever it is. We don't know what you actually paid in taxes, but we want to know what your operating profits would have been net of the highest possible corporate tax. But that's not what they said. Right, your honor. What they said was we need, and I would refer the court specifically to the record page 60741-42 and 60745, which basically stated that the 2001 amendment was done to eliminate confusion around the base net operating profits. And it was done so, so that we could calculate post tax, the net operating profits for the applicable year, 2018, 2019, 2002, whatever that year might be. Right. And then compare it to the same number each year, which was the $3.1151 billion. I'm not sure if that answers your question, your honor, but I think that the history there exemplifies why this adjustment was made or why this amendment was made and the purpose of comparing the profits post tax from the applicable year to the same number each year, because that number didn't change. They made the amount of money they made in 1997 post tax. But under your analysis, the profit does change based on the tax rate. If you're trying to just get profits net of taxes, you would use the same tax rate. You're letting the tax rate in your interpretation affect net profits, the difference in the rates. You see what I'm saying? Normally, taxes are not considered in netting profits. And so if the parties wanted to take net operating profits, exclusives of tax rates, they could have said so. They could have, your honor, but they included tax rates. Why would they want to get a windfall to one side or the other by saying the tax rate is going to be fixed forever at 35 percent, including this number. But if the number goes up or down, whoever wins or loses, whoever hurts or helps, is going to get that that differential between corporate tax rates. Why would they want to do that? I can't answer why they would want to do that, your honor. All I can say is that you're comparing a I think there are probably two reasons. One, there is the idea of consistency. You're comparing the same. You're comparing profits post tax in, let's say, 2022 to profits post tax in 1997 from 1997 financials in 1997 tax rate every single time. And so that is just, I think, for simplicity and to eliminate confusion amongst the parties. Now, I think the second reason is, again, that I understand that traditionally profits are not calculated post tax, but here they are for the purposes of the definition of net operating profits. And so the profits for the settling defendants were what they were. If they came out with more money in their pocket in, let's say, 2023, adjusted for tax or adjusted for inflation rather than they did in 1997, then they need to pay more under the settlement agreement. If they came out with fewer profits post tax, they need to pay less under the settlement. Well, it seems to me what they were doing was trying to get a saying that we don't know what the actual tax rate is going to be. For one company, it might be 5 percent. For another, it might be the full 35. And rather than get look at everybody's individual books and how their different, you know, operation business affected their tax rate, the parties agreed to whatever the tax rate is in effect in any given year is what we're going to deduct for an apples to apples comparison rather than your actual what you actually pay in corporate tax. Are you with me? I'm with you, Your Honor. It's not. It's not exactly. Respectfully, I'd like to push back there. The what the settling defendants actually paid in taxes here, I don't think is particularly relevant. They're trying to compare just taxes or rather profit or operating income and then with a tax rate applied to get to this net operating profits scenario. And they just want to compare those two numbers. The problem is the net operating profits in 1997 were calculated using a 35 percent rate and net operating profits in 2022 should be calculated or were calculated using a 21 percent rate. And so the number can change. And I think the parties anticipated that and they set the three point one one five one billion dollar number in stone to eliminate this confusion. Now, if I may, I want to point out one of the rather and this was highlighted in our brief, but one of the absurd outcomes of the settling defendants argument, which is that I would refer to four to six zero seven five nine of the record, which is an annotated. It's an annotated portion of, I believe, from Philip Morris Appendix A. And there are two portions that go into or two two factors that go into calculating net operating profits, and that is operating income. I also call it financials and then the tax rate. And that gives us net operating profit for both. If you're doing a calculation for both the base year and for the applicable year and under under the settling defendants interpretation, we would need to also apply the applicable year financials or operating income when calculating base year net operating profits. But that doesn't make any sense because then we would be comparing applicable year. Financials and tax rate to the applicable year financials and tax rate that would always zero out what the settling defendants. That is absurd. It seems to me both sides arguments require us to use a little finesse in interpreting this agreement. Applicable year is a problem for both of your arguments, I think, to make everything fit consistently, which gets to my more basic question, I guess. It does seem to me there's an argument that this is ambiguous, that there's some things that weren't done that could have made it clear. And so we have to struggle with the uncertainties. My understanding is that in district court, everybody put in whatever the evidence they thought they had on negotiating history or whatever else of these provisions that would have been useful if you're looking at pro evidence under Texas law because you find ambiguity. Is it fair to say that whatever evidence it was that might help on resolving ambiguity is in the record that has been highlighted probably in the briefs and I find nothing useful in what I have seen. So there are several probably pieces of that you might have to respond to. But is the general point correct that the evidence is already there on what might explain some of this, but none of it really is as much clarity. I think your honor, to your first point, the state doesn't find this ambiguous. It may come as no surprise. But for the sake of argument, there has been evidence submitted that could theoretically help explain it. The only pieces of the record that I've seen that have been cited by the settling defendants would be 61224-29 of the record and 60848 of the record. 60848 and 49 are just the old contract, a prior iteration of the contract. And the former record set that I mentioned, so that's 61224-61229 are, from what I can tell, just calculations of profits from 1997 that were sent to, I believe, the state of  To me, I fail to see how that informs the plaintiffs or the settling defendants' theory that this was actually meant to be recalculated and using a floating tax rate for the base year. And so to the extent that the settling defendants put forth any sort of extrinsic evidence, one, it's being used to read in an ambiguity in contravention to Texas law. And two, it's not particularly helpful. Now, what I will say is helpful is the fact that the parties in the 2001 amendment specifically stated that this was being done to resolve confusion among net operating problems. And putting down that static number, if we just ignore it, it renders it null. And so I do think that to the extent that the court should consider evidence, it should be evidence not that reads in an ambiguity, like the settling defendants would expect, but rather evidence that helps explain and harmonize the contract. I just meant the three point something billion. Why add the reference to the 35% tax rate? It's irrelevant if the three billion and change is never going to change. Why add that parenthetical? So I'm not sure why they would add that parenthetical. I think probably the best interpretation is just as an example. You know, the settling defendants want to say that that three point one one five one billion dollar figure was an example, even though the party said we calculated it using this method and we can do it. And then they stated, look, we use this 35% number. Now, it's unclear and well, not unclear, but I would say the contract does not state that they use the 35% number from 2001. It simply says that the that the applicable year tax rate was 35% in 2001, as it was in 1997. One other thing that I wanted to just briefly address were some of the settling defendants cases that they cited, the first being sharp now sharp, which the site for sharp is going to be seven sixty nine. Third, nine nine, that involved an arbitration clause and settling defendants said, well, if Texas wanted to draft something narrower. If the parties wanted to draft something narrower to specifically include that three point one one five billion dollar number, they would. Well, we did. The sharp case is particularly an opposite because it involves issues of two different contracts, one where both had an arbitration clause in a document that was ancillary to the contract. One one one of the two contracts just had a venue provision. One had specific. Dispute resolution procedures in the court ruled that the arbitration clause could apply to the venue provision did not apply to the to the contract with the distinct dispute resolution procedures. And in our case, they point to the fact that the master settlement agreement between the other states does not involve taxes. Well, that just shows that the parties there agreed to consider the difference in operating income, whereas we decided we agreed to incorporate a tax rate. I believe I am probably at my time. And so unless the court has any additional questions, I will just request that the court affirm the district court's judgment. Thank you, counsel. On this. I think it's. Sorry, I think I think it is my turn. Thank you. I want to follow up on the court's questions. First of all, you are 100 percent correct. We're not comparing after tax incomes, actual after tax incomes. The definition specifically says before income tax. If we wanted to compare after income tax, all we needed to do is to change one word instead of before, say, after taxes that report to the SEC. All of this is as reported to the SEC. So just say after instead of before. And then we would be comparing actual after and after tax incomes, which, of course, do not change with with time. I'll make sure I understood you. The agreement refers to the reporting to the SEC. That would include taxes or is that. Yes. After tax income is reported. It seems to me that taxes can be disputed. It can go on for years, disputes between the companies and IRS. But there is an initial report of the SEC of the initial payment, I guess. There is a there is a report of income tax assignment. Anything in the SEC reporting can be disputed. But the tax is a known number. After tax income is a known number. The intent was not to approximate after income tax. The intent was to have the before tax income. And then, as Josh Richman correctly pointed out, apply a flat rate to it. So you have apples to apples comparison. You're comparing operating income to operating income. This is operating income, not taxable income. Nobody pays tax on this income and nobody pays top marginal rate plus another 4 percent. This is not anywhere near the actual after tax income. And it's not supposed to be. It's supposed to be comparing operating income apples to apples. And evidentiary hearing. Yes, it would be helpful, Your Honor. Not everything was put before the district court. And if you do find this ambiguous, I think evidentiary hearing would indeed help. Thank you. Your Honor. Thank you, Your Honor. Mr. Liebenstein again. I want to first address Judge Sophie's point of maybe they're just trying to show the work. But Your Honor, if so, why in the parenthetical would you use the year 2001? In fact, every single time my friend from Texas always addressed the parenthetical, he always said as of 2001, which was the same for 1997. If you're trying to show your work for 1997 of the foregoing definition, use 1997. The reason why they didn't is because the 2001 is the one that's used. That's the current year is used for the base. And to address Judge Richman's point, I agree 100 percent about everything you said. And I just want to add to it. There's in fact two separate clauses. There's a B, Romanette 2, 1, which is everything about net operating profits. And then they have a separate clause which discusses the tax rate, a 35 percent fixed tax rate, which changes over time, which could change over time. And Your Honor, if they wanted to just have a uniform tax rate, why do they need two clauses? The only reason for having two clauses is because it's a major difference between the two. It's the parenthetical makes sense, and it's the based on foregoing definition makes sense. And that's because in the first net operating profits, there actually is a difference between the base year and the current year. Obviously, once the net operating profits. But for purpose of getting an apples to apples comparison in the second year, in the second clause for that, they changed it and they made it as of May 1st, 2001. We're going to use that base year. I'm sorry. We're going to use that tax rate for the base year as well. And if it later changes in the future in 2018, we're going to use that one as well. And that's the reason why it says based on the foregoing definition. It's not to show your work because there's really no reason to show work. But even if there were reasons to show work, the work that's being shown is specifically because it's a changeable tax rate. That's the reason why they did it. And Your Honor, I want to address one point on allocation, which is that, just to be clear, I think she is obviously a second defendant. Nothing in the agreement says anything about what to do when somebody buys four grants. Should their profits be combined as one, which is what the court did. And then what PwC did, which is what the parties agreed to do in 2015 to 2019, or to separate them out and come up with an arbitrary $860 million base year for ITG, or let's say a settlement amount of $860 million for ITC. That's what we decided to do for 2024. If there's liability, and again, I emphasize if there's any liability, that should be based on, for 2015 to 2019, the PwC methodology, which was to have them combined. Your Honor, we ask that you reverse the, Your Honor, we ask the court to reverse. Thank you. Thank you. We have your arguments and the case is under submission. Thank you.